UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

VIDAL MAURICE WHITLEY,

                                Plaintiff,

        v.

NURSE ADRIAN BOWDEN;
LIEUTENANT ORAZIO BUCOLO; OMH
UNIT CHIEF HENNESY; OMH
PSYCHIATRIST MEGAN WRIGHT;
PRISON DOCTOR ROBERT B.
BENTIVEGNA,

                                Defendants.[1]

No. 17-CV-3564 (KMK)

OPINION AND ORDER

Appearances:

Vidal Maurice Whitley
Romulus, NY
*Pro Se Plaintiff*

Janice Powers, Esq.
Office of the New York State Attorney General
New York, NY
*Counsel for Defendants*

KENNETH M. KARAS, District Judge:

        Pro se Plaintiff Vidal M. Whitley ("Plaintiff") filed the instant Complaint ("Complaint"),

pursuant to 42 U.S.C. § 1983, against Nurse Adrian Bowden ("Bowden"), Lieutenant Orazio

Bucolo ("Bucolo"), Office of Mental Health ("OMH") Unit Chief Hennesy ("Hennesy"), OMH

Psychiatrist Megan Wright ("Wright"), and Prison Doctor Robert Bentivegna ("Bentivegna")

---

[1] The Parties spell Hennesy's name differently throughout their submissions. For ease of
reference, the Court adopts the spelling from the caption in this Opinion.

(collectively, "Defendants").  (Compl. (Dkt. No. 1).)[2]  Plaintiff alleges that Defendants violated

his rights under the Eighth and Fourteenth Amendments when they were deliberately indifferent

to his medical needs resulting from a drug overdose.  (*Id.* at 4–5.)[3]

Before the Court is Defendants' Motion to Dismiss the Complaint pursuant to Federal

Rule of Civil Procedure 12(b)(6).  (*See* Notice of Mot. To Dismiss (Dkt. No. 31); Mem. of Law

in Supp. of Defs.' Mot. to Dismiss ("Defs.' Mem.") (Dkt. No. 32).)  For the following reasons,

Defendants' Motion is granted in part and denied in part.

## I.  Background

### A.  Factual Background

The following facts are drawn from Plaintiff's Complaint, (Compl.), a letter submitted in

response to Defendants' request for a pre-motion conference, (Letter from Plaintiff to Court (Jan.

9, 2018) ("Obj. Letter") (Dkt. No. 23)), and Plaintiff's opposition to the Motion to Dismiss,

which includes attached exhibits, (Pl.'s Opp'n to Mot. to Dismiss from Defs. ("Pl.'s Mem.")

(Dkt. No. 35)), and are taken as true for the purpose of resolving the instant Motion.  During the

time of the alleged events, Plaintiff was a convicted prisoner at Green Haven Correctional

Facility in Stormville, New York ("Green Haven").  (Compl. 4.)[4]

At some point, Plaintiff "requested to see OMH [and] . . . was denied."  (*Id.*)  Afterwards,

---

[2] Plaintiff also sued the New York Department of Correction and Community Supervision ("DOCCS") and other individuals, (*see* Compl.), but the Court dismissed those defendants in orders dated June 20, 2017 and September 6, 2017, (*see* Dkt. Nos. 7, 9).

[3] The Complaint is on a standard prisoner complaint form without any pagination.  For ease of reference, the Court will cite to the ECF-generated page numbers.

[4] On April 11, 2018, the Court ordered the Parties to inform the Court whether Plaintiff was a convicted prisoner or a pretrial detainee at the time of the alleged events in August 2016. (Order (Dkt. No. 37).)  The Parties confirmed that Plaintiff was a convicted prisoner.  (Letter from Janice Powers, Esq., to Court (April 11, 2018) (Dkt. No. 38); Letter from Plaintiff to Court (April 20, 2018) (Dkt. No. 41).)

on August 4, 2016, from approximately 12:30 am to 1:30 am, while in SHU, Plaintiff "overdosed on several pills that were not prescribed to [him]" and "was denied medical attention several times," despite "complaining of dizziness[,] throwing up[,] [and] passing out." (*Id.*) Specifically, "during [the] 3 to 11 shift on 2 gallery," Bowden, a nurse, "came to see someone else who was having chest pains [and] then she came to see [Plaintiff]." (*Id.*)[5] Plaintiff "swallowed 20 pills in front of her[,] a sergeant [, and] other officers." (*Id.*) "They all looked at [Plaintiff][,] laughed [and] walked off." (*Id.*; *see also* Pl.'s Mem. 5 ("Bowden . . . walked away knowing [Plaintiff] overdosed.").) Plaintiff "wasn't given any mental health assistance . . . or medical assistance." (Compl. 4–5; Pl.'s Mem. Ex. B ("Psychiatric Progress Note") ("He reports that he had asked to speak to OMH at 1:30 AM on 8/4/16 but 'was ignored' until that afternoon.").) "Instead, [he] was denied [assistance] until 2:30 pm the next day." (Compl. 5; *see also* Pl.'s Mem. 3 ("I [first] overdose[d] on 8/3/16 then again 8/4/16 [and] I wasn't ever given adequate medical care until 8/5/16."); *id.* at 5 ("None of the Defendants involved offered any medical care."); *id.* ("No psychiatric assessment ever took place by said [D]efendants[;] in fact Sing Sing had to do Defendants['] jobs for them.").)

"DOCCS staff kept attempting . . . to move [Plaintiff] without any medical assistance," but Plaintiff "couldn't" because he "was sick." (Compl. 5.) "OMH Staff Unit Chief . . . Hennesy [and] psychiatrist Megan Wright conspired with DOCCS Lieutenant . . . Bucolo to have

---

[5] To the extent the "3 to 11 shift" means from 3 to 11 pm, these times are inconsistent with the times Plaintiff listed for when the events giving rise to his claims occurred. (Compl. 4.) However, Plaintiff states in his opposition papers that he "[first] overdose[d]" on August 3, 2016, so, construing his submissions liberally, he may be alleging that the incident with Bowden happened on the night of August 3, 2016 and the following events occurred in the early morning of August 4, 2016—namely, his second overdose and his transfer to Sing Sing. (Pl.'s Mem. 3; *id.* at 7; *but see id.* Ex. B ("Psychiatric Progress Note") ("He states that he took overdose of 20 pills in the early morning hours [on August 4, 2016] and another 30 pills later in the day 'to get people to do their jobs.'").)

[Plaintiff] moved without following proper policy [and] procedure." (*Id.*; *see also* Pl.'s Mem. 9 ("I told psychiatrist Megan Wright [and] so did DOCCS employees/Defendants who all obviously knew [and] so did Unit Chief Anne Hennesy."); *id.* at 10 ("It is obvious they all conspired to get me out of their prison before . . . I expired without adequate medical assistance."); *id.* (alleging that Wright and Hennesy "knew [and] chose to stay quiet about [Plaintiff] overdosing").) Specifically, Defendants failed to follow DOCCS Directive 4101, entitled "Inmate Suicide Prevention." (*Id.* at 4 (citing *id.* Ex. A ("DOCCS Dir. 4101")).)[6] And, Wright, despite knowing about Plaintiff's overdoses, did not mention them in the Termination Transfer Progress Note she prepared for Sing Sing, which "means . . . Hennesy did also[,] as she gives . . . Wright her orders to follow." (*Id.* at 10–11 (citing *id.* Ex. C ("Transfer Note")); *see also id.* at 13 ("Hennesy had to [have] told . . . Wright not to mention anything about the overdoses . . . [because of] what a Unit Chief['s] primary role is in the instant of an inmate overdosing or attempting any form of suicide in Directive 4101.").)

Plaintiff "was talking to . . . Bucolo[,] telling him [Plaintiff] was sick," but Bucolo "didn't care" and "threatened [Plaintiff] viciously with a CERT team[,] saying [Plaintiff] was leaving one way or another." (Compl. 5.) Plaintiff "swallowed [and] overdosed again on 30 more pills right in front of . . . Bucolo." (*Id.*) "[H]e stated [']how do I know those are pills [and]

---

[6] DOCCS Directive 4101, dated January 25, 2018, is entitled "Inmate Suicide Prevention." (DOCCS Dir. 4101.) *See also* New York State Dep't of Corrections and Community Supervision, Directive 4101, Inmate Suicide Prevention http://www.doccs.ny.gov/Directives/4101.pdf. This directive sets forth DOCCS' policy "to effectively monitor all inmates for the potential for self-harm or suicide attempts in order to ensure the effective delivery of mental health care by [OMH] and to preserve the safety and lives of the inmates under its custody." (*Id.* at 1.) Plaintiff attached this directive to his opposition, and in any event the Court may take judicial notice of it when deciding the Motion to Dismiss. *See Jones v. Annucci*, No. 16-CV-3516, 2018 WL 910594, at *5 n.3 (S.D.N.Y. Feb. 14, 2018) (taking judicial notice of a DOCCS directive).

not toilet paper.[']" (*Id.*) Bucolo then "walked away knowing [Plaintiff] overdosed [and] chose not to follow DOCCS Directive . . . 4101," which provides that "staff are not suppose[d] to walk off after a[] suicide attempt or a suicide has occurred in their presence." (Pl.'s Mem. 5.)[7]

On August 4, 2016, Plaintiff "was transported to Sing Sing [Correctional Facility] on camera." (Compl. 5; *see also* Pl.'s Mem. 6 (noting that transfer occurred on 8/4/16); Transfer Note (same).) Once he was "dropped off at Sing Sing . . . by Green Haven [he] was seen by Nurse Johnsosocko who had no idea about th[ese] altercation[s]." (Compl. 5; *see also* Pl.'s Mem. 6 (alleging that he "explained everything to" Nurse Johnsosocko); *id.* at 7 ("I told [Nurse Johnsosocko] I had overdosed on 60 pills in Green Haven."); *id.* at 10 ("When I get to Sing Sing . . . Nurse Johnsosocko didn't even know I was coming [and] didn't know anything regarding me overdosing [and] being sick.").) Plaintiff "was sent to SHU [and] not mental health observation . . . where [he] was observed still throwing up[,] [having] dizzy spells[,] [and] passing out by C.O. Tyrone Darden." (Compl. 5; *see also* Pl.'s Mem. 6 (alleging that Plaintiff "was never placed on . . . suicide watch" at Green Haven or Sing Sing, and was instead "observed by CO Tyrone Darden on rounds throwing up very very sick from the 50 pills."); *id.* at 7 ("Nurse Johnsosocko then told officers [and] Sergeant Carabello I could go to SHU in Sing Sing."); Obj. Letter 4 (alleging that Johnsosocko sent Plaintiff to SHU "and not to a[] mental health PSU cell").) Darden "asked what was wrong," and Plaintiff "explained everything to him." (Pl.'s Mem. 6.)

---

[7] Plaintiff also alleges that Doctor Robert Bentivegna knew about his overdoses because he "had to [have been] briefed by his own co-workers [and] obviously was by myself on his daily rounds," and that Bentivegna told Plaintiff "he would talk to the powers that be [and] see what they wanted to do," rather than following proper protocol once he "received the notion [Plaintiff] attempted suicide." (Pl.'s Mem. 9; *see also id.* at 10 (alleging that Bentivegna "knew [and] chose to stay quiet about it."); Obj. Letter 1–2 ("Bentivegna was informed by me [and] I'm sure his peers that I had indeed overdosed on several pills (50) [and] this man did not follow 'DOCCS' policy [and] procedure. . . . [He] simply told me he would speak to the powers that be [and] see what they wanted to do which puts [and] places [him] at fault.") .)

Darden then "told [Plaintiff] to tell OMH Therapist Gary Coonley on rounds the next day," August 5, 2016, which Plaintiff "did." (*Id.*; *see also id.* at 8 ("[Darden] wanted [Plaintiff] to tell therapist Coonley of OMH in the morning [and to] see if [Plaintiff] could make it thru the night."); Psychiatric Progress Note ("He was evaluated in SHU on 8/5/16 by G. Coonley, SW, who referred patient for medical evaluation.").) Coonley told Plaintiff "to tell Doctor Felix Ezekwe," which Plaintiff did, and Ezekwe "told [Plaintiff] to put in a sick call." (Pl.'s Mem. 6.) Plaintiff "then told CO Povez [and] then [he] was taken to medical in Sing Sing by CO Povez[,] who forced Dr. Felix Ezekwe to see [Plaintiff]." (*Id.*; *see also id.* at 8 ("I told CO Povez who observed [and] notice[d] I wasn't looking so good [and] he took me to Sing Sing ER [and] forced Dr. Ezekwe to see me.").) Plaintiff was then "taken to [an] outside hospital . . . Mount Vernon[,] for the [first] time ever" on August 5, 2016. (*Id.* at 6; *see also id.* at 8 (same); Compl. 5 ("OMH therapist Gary Coonley[,] CO Poyez[,] [and] Doctor Felix Ezekwe sent [Plaintiff] to [an] outside hospital the next day . . . Mount Vernon Hospital.").)

As a result of these events, Plaintiff's "liver was badly affected as well as [his] kidneys." (*Id.*; *see also* Pl.'s Mem. 4 (describing "adverse medical consequences/complications" Plaintiff suffered and explaining that he "spent 5 days hospitalized"); Psychiatric Progress Note ("[Plaintiff] suffered adverse medical consequences as evidenced by elevated ammonia levels.").) Plaintiff also mentally suffered and was "depressed and disoriented." (Compl. 5.) He therefore requests $115,000,000 in damages and "indefinite suspensions and revoking of [the] license[s] of" Defendants. (*Id.* at 7.)

B. Procedural Background

Plaintiff filed the Complaint on May 5, 2017. (Compl.) He was granted in forma pauperis status on June 7, 2017. (Dkt. No. 6.) On June 20, 2017, the Court issued an Order

requiring Plaintiff to either file an amended complaint clearly specifying which of the additional ten defendants not in the caption of the Compliant he intends to sue, or alternatively to notify the Court if he intends to instead proceed with the original Complaint. (Order 2–3 (Dkt. No. 7).) The Court also dismissed Plaintiff's claims against DOCCS as barred by the Eleventh Amendment. (*Id.* at 3–4.) On August 4, 2017, Plaintiff informed the Court that he will keep the original Defendants and add one additional Defendant—Doctor Robert Bentivegna. (Letter from Plaintiff to Court (Aug. 4, 2017) (Dkt. No. 8).) On September 6, 2017, the Court issued an Order adding Bentivegna to the caption of the case and directing service on Defendants. (Order of Service (Dkt. No. 9).) All Defendants were served. (*See* Dkt. Nos. 11–15.)

After receiving an extension, (Dkt. No. 21), Defendants filed a pre-motion letter indicating the grounds on which they would move to dismiss the Complaint, (Letter from Janice Powers, Esq., to Court (Dec. 18, 2017) (Dkt. No. 20)). The Court then set a briefing schedule. (Dkt. No. 21.) On January 9, 2018, Plaintiff filed a letter opposing Defendants' request and attaching an authorization of release of health information form. (Obj. Letter.) On January 3 and January 17, 2018, Plaintiff filed letters requesting the appointment of pro bono counsel, (Letter from Plaintiff to Court (Jan. 3, 2018) (Dkt. No. 22); Letter from Plaintiff to Court (Jan. 17, 2018) (Dkt. No. 24)), which the Court denied without prejudice, (Order (Dkt. No. 25)).[8] After receiving an extension, (Dkt. No. 29), Defendants filed their Motion to Dismiss and accompanying memorandum on February 14, 2018, (Notice of Mot; Defs.' Mem). On February 15, 2018, Plaintiff filed a letter "requesting evidence" be produced, (Letter from Plaintiff to

---

[8] The Court also ordered Defendants to respond to allegations in Plaintiff's January 17, 2018 letter that he was not receiving his legal mail while in keeplock, (Dkt. No. 26), which Defendants did on February 2, 2018, (Letter from Janice Powers, Esq., to Court (Feb. 2, 2018) (Dkt. No. 28)).

Court (Feb. 15, 2018) (Dkt. No. 33)), which the Court denied as premature prior to deciding the

pending Motion, (Dkt. No. 34). Plaintiff filed his opposition to the Motion to Dismiss on March

12, 2018, (Pl.'s Mem.), and Defendants filed their reply on April 6, 2018, (Defs.' Reply Mem. of

Law in Supp. of Mot. to Dismiss ("Defs.' Reply") (Dkt. No. 36)).[9]

## II.  Discussion

### A.  Standard of Review

The Supreme Court has held that although a complaint "does not need detailed factual

allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his

entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the

elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)

(alteration and internal quotation marks omitted). Indeed, Rule 8 of the Federal Rules of Civil

Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). "Nor does a

complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.*

(alteration and internal quotation marks omitted). Instead, a complaint's "[f]actual allegations

must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

Although "once a claim has been stated adequately, it may be supported by showing any set of

facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege

"only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff

has not "nudged [his or her] claims across the line from conceivable to plausible, the[] complaint

---

[9] On April 16, 2018, Plaintiff sent a letter to the Court requesting the Court deny the
Motion in its entirety because Defendants failed to file a reply. (Letter from Plaintiff to Court
(April 16, 2018) (Dkt. No. 39).) The Court denied his request, noting that Defendants had filed a
timely reply and had mailed a copy to Plaintiff. (Dkt. No. 40.)

must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint

states a plausible claim for relief will . . . be a context-specific task that requires the reviewing

court to draw on its judicial experience and common sense.  But where the well-pleaded facts do

not permit the court to infer more than the mere possibility of misconduct, the complaint has

alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (citation omitted)

(second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a

notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but

it does not unlock the doors of discovery for a plaintiff armed with nothing more than

conclusions.").

In considering Defendants' Motion To Dismiss, the Court is required to "accept as true

all of the factual allegations contained in the [C]omplaint." *Erickson v. Pardus*, 551 U.S. 89, 94

(2007) (per curiam); *see also Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) (same).  And, the

Court must "draw[] all reasonable inferences in favor of the plaintiff." *Daniel v. T & M Prot.*

*Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*,

699 F.3d 141, 145 (2d Cir. 2012)).  Where, as here, a plaintiff proceeds pro se, the Court must

"construe[] [his complaint] liberally and interpret[] [it] to raise the strongest arguments that [it]

suggest[s]." *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (per curiam) (internal

quotation marks omitted).  However, "the liberal treatment afforded to pro se litigants does not

exempt a pro se party from compliance with relevant rules of procedure and substantive law."

*Bell v. Jendell*, 980 F. Supp. 2d 555, 559 (S.D.N.Y. 2013) (internal quotation marks omitted).

Generally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its

consideration to facts stated on the face of the complaint, in documents appended to the

complaint or incorporated in the complaint by reference, and to matters of which judicial notice

may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (internal quotation marks omitted). However, when the complaint is drafted by a pro se plaintiff, the Court may consider "materials outside the complaint to the extent that they are consistent with the allegations in the complaint," *Alsaifullah v. Furco*, No. 12-CV-2907, 2013 WL 3972514, at *4 n.3 (S.D.N.Y. Aug. 2, 2013) (internal quotation marks omitted), including, "documents that a pro se litigant attaches to his opposition papers," *Agu v. Rhea*, No. 09-CV-4732, 2010 WL 5186839, at *4 n.6 (E.D.N.Y. Dec. 15, 2010) (italics omitted), statements by the plaintiff "submitted in response to [a] defendant's request for a pre-motion conference," *Jones v. Fed. Bureau of Prisons*, No. 11-CV-4733, 2013 WL 5300721, at *2 (E.D.N.Y. Sept. 19, 2013), and "documents that the plaintiff[] either possessed or knew about and upon which [he or she] relied in bringing the suit," *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000).

### B. Analysis

#### 1. Personal Involvement

Defendant Bentivegna argues that the Amended Complaint should be dismissed against him because he was not personally involved in the alleged constitutional violations. (Defs.' Mem. 3–4; Defs.' Reply 6.) "It is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show . . . the defendant's personal involvement in the alleged constitutional deprivation." *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013). To establish personal involvement, a plaintiff must show that:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Id.* at 139 (alterations, italics, and internal quotation marks omitted).  In other words, "because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."  *Iqbal*, 556 U.S. at 676.  Therefore, Plaintiff must plausibly allege that Bentivegna's actions fall into one of the five categories identified above.  *See Lebron v. Mrzyglod*, No. 14-CV-10290, 2017 WL 365493, at *4 (S.D.N.Y. Jan. 24, 2017) (holding that the five categories "still control[] with respect to claims that do not require a showing of discriminatory intent" post-*Iqbal*).

Bentivegna is not mentioned in the Complaint.  (*See* Compl.)  However, Plaintiff makes allegations about Bentivegna's involvement in his other submissions, which the Court will consider.  *See Vlad-Berindan v. MTA New York City Transit*, No. 14-CV-675, 2014 WL 6982929, at *6 (S.D.N.Y. Dec. 10, 2014) (collecting cases and holding that a court may rely on factual allegations raised for the first time in a pro se plaintiff's opposition papers if consistent with the allegations in the complaint).  Construing his submissions liberally, Plaintiff alleges that Bentivegna knew that Plaintiff overdosed but failed to provide him medical aid or otherwise act on that information.  (*See* Pl.'s Mem. 9–10; Obj. Letter 1–2.)  Bentivegna allegedly knew this because (1) Plaintiff informed him, (Obj. Letter 1), (2) he "had to [have been] briefed by his own co-workers," (Pl.'s Mem. 9; *see also* Obj. Letter 1 ("Bentivegna was informed by me [and] I'm sure his peers.")), and (3) he "obviously was by [Plaintiff] on his daily rounds," (Pl.'s Mem. 9).

The second factual allegation—that Bentivegna must have been told about Plaintiff's overdose by his co-workers—is insufficient to plausibly allege personal involvement, because Plaintiff does not allege which co-workers told him this, what they told him, or when, instead offering mere conjecture.  (Obj. Letter 1; Pl.'s Mem. 9.)  *See Samuels v. Fischer*, 168 F. Supp. 3d

625, 636–37 (S.D.N.Y. 2016) (holding that conclusory allegations that a defendant had knowledge of an allegedly unconstitutional act are insufficient to show personal involvement and collecting cases); *see also Lara-Grimaldi v. Cty. of Putnam*, No. 17-CV-622, 2018 WL 1626348, at *11 (S.D.N.Y. Mar. 29, 2018) (dismissing a defendant for lack of personal involvement because, among other reasons, the complaint did not allege that the defendant "interacted with . . . any of the [prison] employees responsible for" the allegedly unconstitutional act).  Similarly, Plaintiff's allegations regarding Bentivegna's involvement in the purported conspiracy to transfer Plaintiff to Sing Sing without providing medical attention are purely speculative, and insufficient to plausibly allege Bentivegna's personal involvement as to that claim.  (Pl.'s Mem. 10 ("It is obvious they all conspired to get me out of their prison before I expired without adequate medical assistance.").)  *See Sommer v. Dixon*, 709 F.2d 173, 175 (2d Cir. 1983) ("A complaint containing only conclusory, vague, or general allegations of conspiracy to deprive a person of constitutional rights cannot withstand a motion to dismiss.").

However, taking the first and third theories together, and construing Plaintiff's submissions to raise the strongest argument they suggest, Plaintiff alleges that he told Bentivegna that he took 50 pills—an attempted suicide—while Bentivegna was making his daily rounds, and Bentivegna failed to do anything other than say he would check with his supervisors about what to do.  (Obj. Letter 1–2; Pl.'s Mem. 9.)  Specifically, Plaintiff alleges that he personally "informed" Bentivegna that he "had indeed overdosed on several pills (50)" and "Bentivegna simply told [Plaintiff] he would speak to the powers that be [and] see what they wanted to do," rather than contact a poison control center, an outside hospital, or OMH.  (Obj. Letter 1–2; *see*

*also* Pl.'s Mem. 9 (same).)[10]  Without opining on the constitutionally of these alleged actions, the Court finds that they plausibly allege Bentivegna's personal involvement in the alleged deliberate indifference to Plaintiff's medical needs.  *See Grullon*, 720 F.3d at 139 (listing as categories of personal involvement when a defendant "participated directly in the alleged constitutional violation" or "exhibited deliberate indifference . . . by failing to act on information indicating" a health risk to the plaintiff); *cf. Lara-Grimaldi*, 2018 WL 1626348, at *11 (dismissing claim for lack of personal involvement because "[t]he [c]omplaint contain[ed] no allegations whatsoever that [the defendant] was involved in, aware of, or somehow permitted [the plaintiff] to be placed on 'routine' supervision" rather than suicide watch, nor did it allege that the defendant "interacted with [the plaintiff]"); *Casiano v. Cty. of Nassau*, No. 16-CV-1194, 2017 WL 4484338, at *4 (E.D.N.Y. Sept. 30, 2017) (dismissing for lack of personal involvement because the "[p]laintiff d[id] not allege facts that support an inference that [the defendant] had actual knowledge of the [d]ecedent's specific medical condition, such as allegations that the [d]ecedent directly spoke to [the defendant]").  The Court therefore denies Bentivegna's Motion to Dismiss for lack of personal involvement.

### 2.  Eighth Amendment Claim

Construing his submissions liberally, Plaintiff alleges that Defendants were deliberately indifferent to his suicide attempt—overdosing on pills—by failing to provide him with adequate medical treatment and instead transferring him to Sing Sing.  (Compl. 4–5; Pl.'s Mem 3, 5–6, 9, 12.)  Defendants argue that Plaintiff fails to plausibly allege an Eighth Amendment violation.

---

[10] Plaintiff does not allege specifically when he told Bentivegna about his overdose, but he does allege that he said he had consumed 50 pills, implying that this occurred after he had taken the pills in front of both Bowden and Bucolo.  (*See* Compl. 4–5.)

(Defs.' Mem. 4–9.)[11]

<u>a. Standard of Review</u>

"The Eighth Amendment forbids 'deliberate indifference to serious medical needs of prisoners.'" *Spavone v. N.Y. State Dep't of Corr. Servs.*, 719 F.3d 127, 138 (2d Cir. 2013) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). Such medical needs include "psychiatric or mental health care." *Langley v. Coughlin*, 888 F.2d 252, 254 (2d Cir. 1989). To state a deliberate indifference claim, Plaintiff must plausibly allege (1) "that he suffered a sufficiently serious constitutional deprivation," and (2) that Defendants "acted with deliberate indifference." *Feliciano v. Anderson*, No. 15-CV-4106, 2017 WL 1189747, at *8 (S.D.N.Y. Mar. 30, 2017).

"The first requirement is objective: the alleged deprivation of adequate medical care must be sufficiently serious." *Spavone*, 719 F.3d at 138 (internal quotation marks omitted). In other words, "the inmate must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health." *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013). Analyzing this objective requirement involves two inquiries: "whether the prisoner was actually deprived of adequate medical care," *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006), and "whether the inadequacy in medical care is sufficiently serious," which in turn "requires the [C]ourt to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner," *id.* at 280. "There is no settled, precise metric to guide a court in its estimation of the seriousness of a prisoner's medical condition." *Brock v. Wright*, 315 F.3d 158, 162 (2d Cir. 2003). Nevertheless, the Second Circuit has suggested the following non-exhaustive list of factors to consider when evaluating an

---

[11] As a convicted prisoner, Plaintiff's deliberate indifference claim is analyzed under the Eighth Amendment, because it is an allegation that his "conditions of confinement were a form of punishment." *Darnell v. Pineiro*, 849 F.3d 17, 35 (2d Cir. 2017).

inmate's medical condition: "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) 'the existence of chronic and substantial pain.'" *Id.* (quoting *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)).

"The second requirement is subjective: the charged officials must be subjectively reckless in their denial of medical care." *Spavone*, 719 F.3d at 138. This means that the defendant must "appreciate the risk to which a prisoner was subjected," and have a "subjective awareness of the harmfulness associated with those conditions." *Darnell*, 849 F.3d at 35; *see also Nielsen v. Rabin,* 746 F.3d 58, 63 (2d Cir. 2014) ("Deliberate indifference is a mental state equivalent to subjective recklessness," and it "requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." (internal quotation marks omitted)). In other words, "[i]n medical-treatment cases not arising from emergency situations, the official's state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health." *Id.* (internal quotation marks omitted). A defendant's awareness of the risk of serious harm can be established through "inference from circumstantial evidence," including "from the very fact that the risk was obvious." *Farmer v. Brennan*, 511 U.S. 825, 842 (1994). However, "mere negligence" is insufficient to state a claim for deliberate indifference. *Walker*, 717 F.3d at 125 (internal quotation marks omitted). Neither does "mere disagreement over the proper treatment . . . create a constitutional claim," and accordingly, "[s]o long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Chance*, 143 F.3d at 703.

Defendants argue that Plaintiff fails to satisfy the objective and subjective prongs. (Defs.' Mem. 5–7.)[12]  The Court will address each prong separately.

### b.  Objective Prong

Defendants first argue that Plaintiff does not plausibly allege an objectively serious deprivation, because the alleged lapses in treatment were minor and inconsequential, not resulting in substantial risk of injury.  (*Id.* at 5–6.)  However, the case they rely on does not support their claim.  (*Id.* (citing *Atkins v. Cty. of Orange*, 372 F. Supp. 2d 377 (S.D.N.Y. 2005), *aff'd on other grounds sub. nom. Bellotto v. Cty. of Orange*, 248 F. App'x 232 (2d Cir. 2007)).) In *Atkins*, the district court applied the objective standard analysis from an earlier Second Circuit case, *id.* at 412–13, which held:

> [T]he serious medical need inquiry must be tailored to the specific circumstances of each case.  When the basis for a prisoner's Eighth Amendment claim is a temporary delay or interruption in the provision of otherwise adequate medical treatment, it is appropriate to focus on the challenged *delay* or *interruption* in treatment rather than the prisoner's *underlying medical condition* alone in analyzing whether the alleged deprivation is, in "objective terms, sufficiently serious," to support an Eighth Amendment claim.  There is no need to distinguish between a prisoner's underlying "serious medical condition" and the circumstances of his "serious medical need" when the prisoner alleges that prison officials have failed to provide general treatment for his medical condition.  In a case like this, however, where the prisoner is receiving appropriate on-going treatment for his condition, but, instead brings a narrower denial of medical care claim based on a temporary delay or interruption in treatment, the serious medical need inquiry can properly take into account the severity of the temporary deprivation alleged by the prisoner.

*Smith v. Carpenter*, 316 F.3d 178, 185–86 (2d Cir. 2003) (citations and footnotes omitted).  Put simply, "it's the particular risk of harm faced by a prisoner due to the challenged deprivation of

---

[12] This argument was only briefed on behalf of Defendants Bowden and Bucolo. However, construing Plaintiff's submissions liberally, he raises a deliberate indifference claim against all Defendants.  Therefore, the Court will address these arguments on behalf of all Defendants.

care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract, that is relevant for Eighth Amendment purposes." *Id.* at 186 (citing *Chance*, 143 F.3d at 702–03). Therefore, "failure to provide treatment for an otherwise insignificant [injury] may violate the Eighth Amendment" if it could create a substantial risk of injury absent treatment, while "alleged lapses in treatment [that] are minor and inconsequential," even for "an admittedly serious medical condition," may not pose a substantial risk of injury. *Id.*

Applying this test, the Second Circuit held in *Smith* that, in determining whether an inmate plaintiff proffered an objectively serious deprivation of his "HIV medication on two separate occasions for several days at a time," the proper focus was "on the particular risks attributable to the missed HIV medication, rather than on [his] HIV-positive status alone." *Id.* at 181, 187. Similarly, the district court in *Atkins* evaluated a plaintiff's claim "that he did not receive on a regular basis the medications prescribed to him," and concluded that "although the missed medications may have contributed to his subsequent anxiety attack, the care provided by the defendants did not pose a significant risk of serious harm," because, among other reasons, the plaintiff "was counseled on numerous occasions about his refusal to take his medications" and was "provid[ed] access to a psychiatrist and other clinicians when requested or necessary." *Atkins*, 372 F. Supp. 2d at 413.[13] The court also found that another plaintiff's claim regarding "his delayed psychiatric assessment and delayed administration of psychotropic drugs" did not allege a sufficiently serious deprivation, because he received other adequate care for his psychiatric condition—namely, he was placed "on 'close watch' during that time period to

---

[13] The *Atkins* court appears to have mixed the objective and subjective prongs in its analysis as to this claim, making it unclear which facts it relied upon to find no risk of serious harm and no deliberate indifference on the part of the defendants. *See* 372 F. Supp. 2d at 413. In any event, the Court notes that this case involved a summary judgment motion, not a motion to dismiss, and therefore is less useful at this stage of the case.

ensure that he did not harm himself or others," was "immediately seen by a caseworker and a psychiatrist" after a suicide attempt, and taken to a hospital after a second attempt. *Id.* at 413–14. And, as to another plaintiff, the *Atkins* court rejected her claim of a three-day delay in seeing a psychiatrist and missing several doses of medications, because the plaintiff "failed to allege how she was harmed" by these deprivations and the three-day delay "did not result in a serious condition that could produce death, degeneration, or extreme pain." *Id.* at 415.

Unlike the above cases, Plaintiff has not alleged a "temporary delay or interruption in treatment" for a serious medical condition. *Smith*, 316 F.3d at 186. Rather, he alleges that he made a specific attempt to poison or kill himself by overdosing on pills, and Defendants failed to treat him. In particular, this claim is that Defendants "failed to provide general treatment for his medical condition," and therefore "[t]here is no need to distinguish between [his] underlying serious medical condition and the circumstances of his serious medical need." *Id.* 185–86 (internal quotation marks omitted). Thus, the Court must only determine whether Plaintiff has plausibly alleged that his attempted suicide "pose[d] an unreasonable risk of serious damage to his health." *Walker*, 717 F.3d at 125.

The Court finds that he has. Plaintiff alleges that he took 50 pills which were not prescribed to him, creating a risk of death by poisoning. (Compl. 4–5; Pl.'s Mem. 3.) He specifically alleges that he ingested 20 pills in front of Bowden and 30 in front of Bucolo, and that Bentivegna, Wright, and Hennesy were all aware of that he overdosed on pills. (Compl. 4–5, Pl.'s Mem. 5, 9–11; Obj. Letter 1.) Plaintiff requested medical attention "several times," and was "complaining of dizziness[,] throwing up[,] [and] passing out." (Compl. 4.) However, Plaintiff alleges that did not receive medical treatment following either of these incidents, occurring on August 3rd and 4th, until he was seen by a nurse at Sing Sing, who sent him to

SHU, not mental health observation, and then was transferred to an outside hospital, from Sing

Sing, on August 5. (Compl. 4–5; Pl.'s Mem. 3.)[14]  He also alleges that this denial of medical

treatment resulted in adverse medical consequences such as liver and kidney damage. (Compl.

5; Pl.'s Mem. 4; Psychiatric Progress Note.)  These allegations are sufficient to satisfy the

objective prong of the Eighth Amendment analysis at the Motion to Dismiss stage. *See Boston v.*

*Suffolk Cty.*, No. 14-CV-5791, 2018 WL 344970, at \*12 (E.D.N.Y. Jan. 9, 2018) (denying

summary judgment on objective prong where the defendants "were aware of the ingestion of a

large quantity of drugs, which . . . may have posed a serious and life-threatening danger to the

[p]laintiff" and "there were obvious signs of distress," including vomiting); *Bradway v. Town of*

---

[14] Defendants argue that Plaintiff was seen by an OMH therapist and a doctor at Sing
Sing the "same day" he allegedly swallowed the pills, and thus cannot show that he was actually
deprived of adequate medical care or that the delay caused him harm. (Defs.' Mem. 6–7.)  First,
Defendants' assertion is contradicted by the allegations in the Complaint, as well as Plaintiff's
other submissions, which the Court must take as true and which indicate that Plaintiff was denied
medical attention until the next day. (Compl. 5 ("I was denied until 2:30 pm the next day."); *id.*
(alleging that the Sing Sing doctor "sent [him] to outside hospital the next day 8-5-16"); Pl.'s
Mem. 3 ("I [first] overdose[d] on] 8/3/16 then again 8/4/16 [and] I wasn't ever given adequate
medical care until 8/5/16."); *id.* at 2 (arguing that Defendants "failed to prove [he] was seen by
an OMH employee 8/3/16 or 8/4/16 in Green Haven" or that he "was escorted to" an outside
hospital "by Green Haven . . . after overdosing on 50 pills and almost d[y]ing").)  Second, it is
unclear why Defendants think that the treatment provided by officials at Sing Sing, none of
whom is sued here, means that *Defendants* did not deny Plaintiff prompt medical care for a
problem posing a serious risk of injury and death. *See Salahuddin*, 467 F.3d at 280 (asking "how
the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will
likely cause the prisoner").  Indeed, Plaintiff alleges that Defendants merely transferred him to
Sing Sing rather than provide him any care. (*E.g.* Pl.'s Mem. 5 ("None of the Defendants
involved offered any medical care."); *id.* (No psychiatric assessment ever took place by said
[D]efendants[;] in fact Sing Sing had to do Defendants['] jobs for them.").)  Finally, to the extent
Defendants believe that Plaintiff's claim must fail merely because a day or two is an
insufficiently lengthy delay to constitute a serious deprivation, they cite no cases so holding in
the *drug overdose* context. (*See* Defs.' Mem. 6 & n.1 (citing *Atkins*, 372 F. Supp. 2d at 413–14
(involving delay between admission and psychiatric assessment and noting immediate medical
response after suicide attempts)).)  *Cf. Bradway v. Town of Southampton*, 826 F. Supp. 2d 458,
469–70 (E.D.N.Y. 2011) (finding that a 20-minute delay after ingesting cocaine created a dispute
of fact as to the objective prong).

*Southampton*, 826 F. Supp. 2d 458, 469–70 (E.D.N.Y. 2011) (finding that an arrestee who ingested up to three grams of cocaine in front of officers but was brought back to the police station rather than to the hospital, resulting in at least a 20-minute delay in treatment, created a dispute of fact as to the objective prong); *cf. Atkins*, 372 F. Supp. 2d at 413–14 (dismissing deliberate indifference claim because "after the first suicide attempt [the plaintiff] was immediately seen by a caseworker and a psychiatrist in the mental health unit and after the second suicide attempt he was immediately seen by medical personnel and taken to [an outside] [h]ospital"); *id.* at 415 (dismissing Eighth Amendment claim on the objective prong because the plaintiff "failed to allege how she was harmed" and the delay in time "did not result in a serious condition that could produce death").

### c. Subjective Prong

Defendants also argue that Plaintiff fails to plausibly allege they were deliberately indifferent—that is, subjectively reckless—in their denial of medical care. (Defs.' Mem. 5–7.) Indeed, Defendants argue that they "took affirmative steps or reasonably responded to the suicide attempt." (*Id.* at 5.) However, the Court must take as true Plaintiff's allegations that Defendants were aware of his attempted overdose and took *no* such steps in response, in some cases even affirmatively ignoring his pleas for medical attention. (*E.g.*, Compl. 4–5; Pl.'s Mem. 5, 9–10.) Therefore, the cases cited by Defendants, all of which resolved summary judgment motions made on the basis of a developed record showing that individual defendants took steps in response to known risk that an inmate may commit suicide, are inapposite here. *See Kelsey v. City of New York*, 306 Fed. App'x 700, 703 (2d Cir. 2009) (affirming summary judgment for defendants on deliberate indifference claim because they "took many affirmative steps to protect" the plaintiff from his "suicidal tendencies," including, among other things, "seizing

dangerous items he possessed," "handcuffing him behind his back," and "calling for assistance from an Emergency Services Unit"); *Brown v. Harris*, 240 F.3d 383, 390–91 (4th Cir. 2001) (concluding that the defendant was not deliberately indifferent to the risk that the plaintiff would commit suicide because he "responded by immediately placing [the plaintiff] on 'medical watch,' which established constant video surveillance of [the plaintiff's] cell," even if "failure to take additional precautions was negligent"); *Rhyne v. Henderson Cty.*, 973 F.2d 386, 393 (5th Cir. 1992) (finding no triable fact question as to whether the county's "failure to provide continuous observation of known suicidal inmates constituted a deliberately indifferent method of conducting suicide watches," because the policy to "check on suicidal inmates every ten minutes . . . indicate[d] not apathy, but concern" and there was no "evidence that frequent periodic checks were obviously inadequate"); *id.* at 393–94 (finding "no jury question as to whether [the] [c]ounty's failure to obtain commitment orders for pre-trial detainees [was] deliberately indifferent," because the "policy was not simply to ignore the needs of suicidal inmates," but rather called for "taking affirmative steps to obtain psychiatric care for jail inmates"); *Atkins*, 372 F. Supp. 2d at 411 (dismissing deliberate indifference claim because the plaintiff "was seen by mental health and a psychiatrist within one day of admission to the [j]ail and was on 'close watch' until mental health could see him"); *id.* at 412 (dismissing deliberate indifference claim because the plaintiff "was never denied" mental health care, but rather, "was provided with mental health care upon each admission to the [j]ail and, if she could not immediately be seen . . . was kept on 'close watch' to ensure her safety and the safety of others'"); *id.* at 415 (rejecting claim of substandard medical care because "the record demonstrated] that [the plaintiffs] not only had access to but actually received care, thereby demonstrating that [the] [d]efendants were not wantonly indifferent to [the] plaintiffs' medical

needs"); *Perez v. Cty. of Westchester*, 83 F. Supp. 2d 435, 440 (S.D.N.Y. 2000) (granting summary judgment on qualified immunity grounds because the doctor defendants isolated the plaintiff for "close observation" after he "made suicidal gestures," because "they exercised their best medical judgment," and "[t]he medical records [we]re consistent with the doctors' assertions"), *aff'd*, 242 F.3d 367 (2d Cir. 2000). Again, to the extent that Defendants argue that Plaintiff received immediate medical care or that he was placed on some form of monitoring, these facts contradict Plaintiff's allegations and are not before the Court at the Motion to Dismiss stage. (*See* Defs.' Mem. 7.)

Defendants next argue that they individually did not act with deliberate indifference. (*Id.* at 7; Defs.' Reply 6–7.) The Court will address each Defendant separately.

### i. Bowden and Bucolo

Bowden argues that she was not deliberately indifferent because she "came to see" Plaintiff in his cell and was "[a] medical nurse . . . present with the inmate." (Defs.' Mem. 7 (internal quotation marks omitted).) But, Plaintiff alleges that he "swallowed 20 pills in front of her," which were not prescribed to him, and she "looked at [Plaintiff][,] laughed [and] walked off," rather than render medical assistance, despite the fact that he was "complaining of dizziness[,] throwing up[,] [and] passing out." (Compl. 4–5; *see also* Pl.'s Mem. 5 (alleging that "Bowden . . . walked away knowing [Plaintiff] overdosed" and did not "offer[] any medical care").) Drawing all reasonable inferences in favor of Plaintiff, these allegations are sufficient to show that Bowden, a nurse who could reasonably be expected to understand the medical risks of swallowing 20 unprescribed pills, "fail[ed] to act while actually aware of a substantial risk that serious inmate harm will result," and Bowden cites no case to the contrary. *Nielsen*, 746 F.3d at 63 (internal quotation marks omitted); *see also Farmer*, 511 U.S. at 842 (explaining that a court

22

may infer a defendant's awareness of the risk of serious harm "from the very fact that the risk was obvious"); *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 276–77 (2d Cir. 2009) (denying summary judgment in part because the defendant laughed at the plaintiff's request for an interpreter and "played it as a joke"); *Boston*, 2018 WL 344970, at *14 (denying summary judgment because the defendants "knew that the [p]laintiff had ingested a dangerous amount of . . . drugs," "knew that the . . . drugs he took were not prescribed to him," knew "how much the [p]laintiff claimed to have ingested," and "the [p]laintiff exhibited outward signs of distress that put the officers on notice"); *Bradway*, 826 F. Supp. 2d at 470–71 (denying summary judgment because "the defendant officers were aware that [the plaintiff] ingested cocaine," the plaintiff "was exhibiting signs of distress due to the cocaine ingestion," and at least one defendant was aware that the plaintiff needed to go to the hospital, but they took him to police headquarters instead); *Quinn v. Stewart*, No. 10-CV-8692, 2012 WL 1080282, at *8 (S.D.N.Y. Jan. 18, 2012) ("It can be inferred from [the plaintiff's] repeated requests for pain medication and other treatment that [the doctor defendant and nurse defendant] should have known that the current treatment, or lack thereof, was ineffective."), *adopted by* 2012 WL 1080145 (S.D.N.Y. Apr. 2, 2012).

The same conclusion applies to Bucolo. Plaintiff alleges that, sometime after his first overdose, he "was talking to . . . Bucolo[,] [and] t[old] him [Plaintiff] was sick," but Bucolo "didn't care" and "threatened [Plaintiff] viciously with a CERT team[,] saying [Plaintiff] was leaving one way or another." (Compl. 5; *see also* Pl.'s Mem. 9 (alleging that his claim is "about being moved to another prison while overdosed[,] while not in a cons[cious] mindset[,] being denied adequate medical care").) These allegations alone may be sufficient to plausibly state a claim for deliberate indifference, because Bucolo knew that Plaintiff had overdosed and was

already experiencing symptoms, but threatened to move him to another prison rather than provide medical assistance. *See Bradway*, 826 F. Supp. 2d at 471 (noting the defendant was aware of the amount of drugs ingested and the risks it posed, but transported him to police headquarters instead of a hospital); *see also Thomas v. Ashcroft*, 470 F.3d 491, 497 (2d Cir. 2006) (finding allegations of personal involvement sufficient to maintain a *Bivens* action where the plaintiff "allege[d] that [the defendants] . . . knew of [the plaintiff's] urgent medical needs but ignored them, and nevertheless ordered or acquiesced in his transfer to a[nother] facility where he received no medication"); *Lara-Grimaldi*, 2018 WL 1626348, at *8 (collecting cases denying motions to dismiss claims of deliberate indifference to risks of suicide). But, Plaintiff also alleges that he then "swallowed [and] overdosed again on 30 more pills right in front of . . . Bucolo," who responded "how do I know those are pills [and] not toilet paper," (Compl. 5; Pl.'s Mem. 7), and then "walked away knowing [Plaintiff] overdosed," (Pl.'s Mem. 5). This is sufficient to plausibly allege Bucolo's deliberate indifference, even assuming Bucolo was not sure "what he actually swallowed." (Defs.' Mem. 7.) *See Boston*, 2018 WL 344970, at *14 (finding dispute of fact regarding deliberate indifference because "the [p][laintiff exhibited outward signs of distress that put the officers on notice" and the defendants "knew that the [p]laintiff had ingested a dangerous amount of narcotic drugs" which "were not prescribed to him," and "[a]t the very least, they should have known that the ingestion of a large quantity of drugs placed the [p]laintiff in a serious situation"); *Bradway*, 826 F. Supp. 2d at 472 (noting that a medical indifference claim based on drug ingestion requires "evidence that the officers were aware of the ingestion of large quantities of drugs or other intoxicants which, due to the quantities, pose a serious or life-threatening danger to the [inmate], and/or there were obvious signs of distress from the ingestion"); *cf. Jean v. Barber*, No. 09-CV-430, 2011 WL 2973957, at

\*1, 3–4 (N.D.N.Y. June 28, 2011) (granting summary judgment to non-medical personnel defendant where, after the plaintiff said "he wanted to commit suicide," the defendant "immediately informed [another] officer on the shift, who then informed [a medical personnel defendant]" who saw the plaintiff and continued to observe him), *adopted by* 2011 WL 2975218 (N.D.N.Y. July 21, 2011); *Lee v. Frederick*, 519 F. Supp. 2d 320, 327–28 (W.D.N.Y. 2007) (granting summary judgment to defendant because, although the defendant "walked away from [the plaintiff's] cell" and left him there "for six or seven hours without medical attention" after the plaintiff said "he had no vision in his left eye," the defendant "forwarded [the] plaintiff's complaints . . . to [another defendant], who came to [the] plaintiff's cell and had plaintiff taken to an outside hospital, where he received appropriate treatment," and there was "no indication that [either defendant] deliberately delayed taking action for the purpose of causing [the] plaintiff pain or prolonging his suffering").[15]

### ii.  Bentivegna

Bentivegna argues that Plaintiff only speculates about what he "should've done" rather than allege facts regarding what "Bentivegna did."  (Defs.' Reply 6.)  This argument also fails. Plaintiff alleges that, during Bentivegna's daily rounds, and after Plaintiff had already taken the

---

[15] Plaintiff also alleges that Bucolo and Bowden violated DOCS Directive 4101 by walking away after his suicide attempt.  (Pl.'s Mem. 5.)  Even assuming that this DOCCS Directive, dated January 25, 2018—after the events relevant to this case took place—is applicable, (DOCCS Dir. 4101), "the law is settled that the failure to follow a DOCS Directive or prison regulation does not give rise to a federal constitutional claim," *Rivera v. Wohlrab*, 232 F. Supp. 2d 117, 123 (S.D.N.Y. 2002); *see also McFadden v. Fischer*, No. 13-CV-559, 2016 WL 5661824, at \*7 (W.D.N.Y. Sept. 30, 2016) (holding that violating a DOCCS regulation does not establish deliberate indifference and collecting cases).  The same conclusion holds true for the allegations that Bentivegna violated DOCCS Directive 4101.  (Pl.'s Mem. 9.)  Moreover, to the extent that Plaintiff would have "prefer[red] a different treatment," such as referring him to an outside hospital or calling poison control, these claims "do[] not give rise to an Eighth Amendment violation," *Chance*, 143 F.3d at 703.

50 pills and was showing signs of illness, he told Bentivegna, a doctor, that he "overdosed" on 50 pills and Bentivegna replied only that "he would speak to the powers that be [and] see what they wanted to do," rather than take any immediate action. (Obj. Letter 1–2; Pl.'s Mem. 9; *see also* Compl. 4–5 (describing symptoms).) Construing his submissions liberally, Plaintiff also alleges that Bentivegna then left Plaintiff alone in his cell and never contacted anyone at Green Haven to provide Plaintiff with medical care; instead, Plaintiff was extracted from his cell and taken to Sing Sing, where, because their officials were not made aware of Plaintiff's condition, he did not immediately receive medical care. (Pl.'s Mem. 9–11 (alleging that Bentivegna left Plaintiff's cell and did not contact others for medical assistance, that Plaintiff was then "moved to another prison while overdosed" and "denied adequate medical care" though he "begged for medical assistance," that he was "sick in . . . Defendants['] FACES," but moved to Sing Sing, where the nurse "didn't know anything regarding [Plaintiff] overdosing [and] being sick," and that Bentivegna "knew [and] chose to stay quiet about it" as Plaintiff was moved to Sing Sing and they "knew 0% percent about what occurred in Green Haven," because medical attention there "NEVER HAPPENED").) These allegations, similar to those against Bowden and Bucolo, are sufficient to plausibly allege deliberate indifference. *See Melvin v. Cty. of Westchester*, No. 14-CV-2995, 2016 WL 1254394, at *9 (S.D.N.Y. Mar. 29, 2016) (denying motion to dismiss where the defendants "did not provide [the plaintiff] with *any* care" and instead "sent [the plaintiff] back to his cell, leaving him moaning and agonizing in pain" (internal quotation marks omitted)); *id.* at *9 n.6 (holding that while a defendant's comments alone did not demonstrate deliberate indifference, "the complete denial of medical care after [the plaintiff's] collapse . . . does"); *Baptiste v. Warden at Ottisville, FCI N.Y.*, No. 09-CV-5523, 2010 WL 3185748, at *8 (S.D.N.Y. Aug. 11, 2010) (finding the plaintiff's claims "sufficiently plausible to survive a

motion to dismiss" where he alleged that the defendant doctor "watched [him] endure 'pain and suffering and loss of eyesight,' instead of discontinuing the [prescribed treatment] and performing additional tests to arrive at a more conclusive diagnosis" (alteration omitted)); *Hardy v. City of New York*, 732 F. Supp. 2d 112, 132 (E.D.N.Y. 2010) (denying summary judgment because the defendants were aware of the plaintiff's medical condition "but declined to provide him any medical care despite [the plaintiff's] pleas that he be" treated, instead "simply explain[ing] . . . that they planned to do nothing because [the prison] was a transit facility").[16]

### iii. Wright and Hennesy

Wright and Hennesy argue that Plaintiff's allegations against them are purely conclusory and therefore fail to plausibly allege deliberate indifference. (Defs.' Reply 6–7.) The Court agrees. Construing Plaintiff's submissions liberally, he alleges that Wright, an OMH psychiatrist, knew that he overdosed but did nothing about it, instead acquiescing in Plaintiff's transfer to Sing Sing without mentioning his suicide attempts in the Termination Transfer Progress Note she prepared for Sing Sing or otherwise providing medical treatment. (Pl.'s Mem. 9–11, 13 (citing Transfer Note).) However, Plaintiff does not allege *how* or *when* Wright knew that he overdosed. He alleges that "[he] told . . . Wright [and] so did DOCCS employees/Defendants who all obviously knew . . . [and] now I'm escorted from Green Haven . . . to Sing Sing . . . sick." (Pl.'s Mem. 9.) But, unlike with Bowden, Bucolo, and Bentivegna, Plaintiff does not specify what Wright was told, where she was told, or how soon after the overdoses she was told. For example, Plaintiff does not allege that he told Wright while he was in his cell, such that it could reasonably be inferred that Wright observed his symptoms but failed

---

[16] That Bentivegna may have actually contacted someone to provide medical care or may have taken other actions in the exercise of his medical judgment are facts not alleged by Plaintiff and therefore not before the Court at this stage.

to act.  (*Cf.* Pl.'s Mem. 9 (alleging that Bentivegna "was by [Plaintiff] on his daily rounds,"
spoke to Plaintiff, and left his cell); Compl. 4–5 (alleging that he swallowed pills "in front of"
Bowden and Bucolo and that he told Bucolo he "was sick").)

   To the extent that Plaintiff is now alleging that he personally spoke with Wright, a Green
Haven OMH psychiatrist, prior to leaving for Sing Sing, (*e.g.* Pl.'s Mem. 13 ("[P]er
[Defendants'] counsel['s] . . . statement I was seen by in house medical staff employee[s] from
OMH at Green Haven . . . so this means . . . Wright knew 100% I overdosed."), this allegation
contradicts his other allegations that he received no medical attention, particularly from OMH at
Green Haven, (Compl. 4; Pl.'s Mem 2, 11 (arguing that he was never evaluated by an OMH
employee at Green Haven)).  *See Carson Optical Inc. v. eBay Inc.*, 202 F. Supp. 3d 247, 255
(E.D.N.Y. 2016) ("[W]here [the] plaintiff's own pleadings are internally inconsistent, a court is
neither obligated to reconcile nor accept the contradictory allegations in the pleadings as true in
deciding a motion to dismiss." (internal quotation marks omitted)).  The Termination Transfer
Progress Note, which is signed by Wright and dated August 5, 2016, does nothing to clarify this
contradiction, because it was filled out after Plaintiff's transfer to Sing Sing, on August 4, 2016,
and does not specify that Wright personally evaluated Plaintiff or when any such evaluation
occurred.  (Transfer Note.)  Nor does Plaintiff elaborate upon who the unnamed DOCCS
employees or Defendants are that "obviously knew" about his overdose and told Wright.  (Pl.'s
Mem. 9.)  Absent further factual detail, Plaintiff alleges only that Wright somehow knew
something about his overdose, at some point, and failed to disclose it in the Termination Transfer
Progress Note prepared for Sing Sing on the day after Plaintiff was already transferred.  This
alone is insufficient to plausibly allege that Wright was deliberately indifferent to Plaintiff's
medical needs.  *See Darnell*, 849 F.3d at 35 (requiring a defendant to "appreciate the risk to

which a prisoner was subjected" and have a "subjective awareness of the harmfulness associated with those conditions"); *Stewart v. City of New York*, No. 15-CV-4335, 2018 WL 1633819, at *8 (S.D.N.Y. Mar. 31, 2018) ("To survive a motion to dismiss on this theory [of deliberate indifference to medical needs], [the plaintiff] must still plausibly allege that [the] [i]ndividual [d]efendants intentionally or recklessly delayed his access to care when they knew or should have known that the delay posed an excessive risk to his health or safety."); *Ward v. Capra*, No. 16-CV-6533, 2018 WL 1578398, at *6 (S.D.N.Y. Mar. 29, 2018) (dismissing claim on subjective prong because the plaintiff "offer[ed] only conclusory allegations that [the defendant] was . . . 'fully aware' of [the] [p]laintiff's condition"); *cf. Andrew v. Bellevue Hosp.*, No. 13-CV-8531, 2015 WL 5772201, at *2 (S.D.N.Y. Sept. 29, 2015) (finding that allegations that the plaintiff initially received one treatment at Belleuve but "was transferred to a facility where he could not get the treatment . . . imply knowledge that the treatment was necessary and, despite that knowledge, disregard of the risk involved in ordering a transfer").

Similarly, Plaintiff fails to plausibly allege that Hennesy was deliberately indifferent. Plaintiff makes several conclusory allegations regarding Hennesy's knowledge about his overdose, but fails to provide any detail regarding how or when she knew. (Pl.'s Mem. 9 (alleging that Hennesy "obviously knew"); *id.* at 10 (alleging that Hennesy "knew [and] chose to stay quiet about [Plaintiff] overdosing").) These allegations, without more, do not plausibly allege awareness "of a substantial risk that serious . . . harm will result" if Plaintiff is not provided medical care, or if he is instead transferred to Sing Sing. *Nielsen*, 746 F.3d at 63; *see also Ward*, 2018 WL 1678398, at *6 (dismissing "conclusory allegations" of awareness). Plaintiff also offers speculative and conclusory allegations that Hennesy must have ordered Wright not to disclose Plaintiff's overdose attempts in the Termination Transfer Progress Note,

but, even assuming these omissions are actionable, Hennesy cannot be held liable for Wright's

actions merely because of her supervisory position as OMH Unit Chief. (Pl.'s Mem. 11 ([B]eing

that . . . Wright did this means Unit Chief . . . Hennesy did also as she gives . . . Wright her

orders to follow."); *id.* at 13 ("Hennesy had to [have] told . . . Wright not to mention anything

about the overdoses [because of] what a Unit Chief['s] primary role is in the instan[ce] of an

inmate overdosing or attempting any form of suicide in Directive 4101.").) *See Victory v.*

*Pataki*, 814 F.3d 47, 67 (2d Cir. 2016), *as amended* (Feb. 24, 2016) ("A defendant in a § 1983

action may not be held liable for damages for constitutional violations merely because he held a

high position of authority." (internal quotation marks omitted)); *Ayers v. Coughlin*, 780 F.2d 205,

210 (2d Cir. 1985) (holding that personal involvement "requires a showing of more than the

linkage in the prison chain of command"). Absent more particularized allegations that Hennesy

ordered Wright to make these omissions in the Termination Transfer Progress Note or that she

was aware of Wright's actions and thus could reasonably be inferred to have been deliberately

indifferent to them by condoning them, Plaintiff has failed to plausibly allege Hennesy's

personal involvement in the denial of his medical care, let alone that she was deliberately

indifferent. *See, e.g.*, *Stamile v. Cty. of Nassau*, No. 10-CV-2632, 2014 WL 1236885, at *6

(E.D.N.Y. Mar. 25, 2014) (collecting cases finding conclusory allegations of awareness of

subordinate's actions insufficient to establish personal involvement in deliberate indifference

claim).

### d. Qualified Immunity

Bowden, Bucolo, and Bentivegna argue that even if Plaintiff has stated an Eighth

Amendment claim, they are nonetheless shielded by qualified immunity. (Defs.' Mem. 9–10.)

"Qualified immunity attaches when an official's conduct does not violate clearly established

statutory or constitutional rights of which a reasonable person would have known." *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (per curiam) (internal quotation marks omitted). "[U]sually, the defense of qualified immunity cannot support the grant of a Rule 12(b)(6) motion," but a district court may grant a Rule 12(b)(6) motion on the ground of qualified immunity if "the facts supporting the defense appear on the face of the complaint." *McKenna v. Wright*, 386 F.3d 432, 435–36 (2d Cir. 2004) (emphasis, alterations, and internal quotation marks omitted).

Defendants make no actual arguments about why they are entitled to qualified immunity. Rather, they cite generic caselaw establishing the qualified immunity standard and apply it to this case in a single sentence:

> In this matter, the facts as pled and evidence submitted do not show a violation of a constitutional right nor do they establish that any of the defendants had reason to believe an established law [w]as being violated.

(Defs.' Mem. 9–10.) The Court therefore declines to consider this argument, because it is "not sufficiently argued" by Defendants, who are represented by counsel and attempting to dismiss a pro se Complaint. *Norton v. Sam's Club*, 145 F.3d 114, 117 (2d Cir. 1998); *see also Sioson v. Knights of Columbus*, 303 F.3d 458, 460 (2d Cir. 2002) ("Perhaps counsel for [the] [a]ppellant intends that we form an argument for him, by looking into the record to document the 'facts' posited in his 'statement of the case,' and then examining various combinations of these facts in the light of the legal doctrines he later mentions. But that is simply not our job, at least in a counseled case."); *Tutor Time Learning Centers, LLC v. GKO Grp., Inc.*, No. 13-CV-2980, 2013 WL 5637676, at *1 (S.D.N.Y. Oct. 15, 2013) (noting that the "[d]efendants['] conclusory . . . statement that the authorities they cite are 'equally applicable' to [the statute] does not suffice to raise the argument"); *Am. Tissue, Inc. v DLJ Merch. Banking Partners, II, L.P.*, No. 03-CV-6913, 2006 WL 1084392, at *6 (S.D.N.Y. Apr. 20, 2006) (dismissing claims with prejudice

because the party's brief "fail[ed] to address with any seriousness the legal sufficiency of those claims"). However, Defendants are free to renew—and sufficiently argue—their qualified immunity defense at a later date.

Accordingly, the Court grants the Motion to Dismiss Plaintiff's Eighth Amendment claims against Wright and Hennesy but denies the Motion to Dismiss the Eighth Amendment claims against Bowden, Bucolo, and Bentivegna.[17]

### 3. Conspiracy Claim

Plaintiff alleges that Hennesy, Wright, and Bucolo conspired to move Plaintiff to Sing Sing without providing him medical assistance. (Compl. 5; Pl.'s Mem. 10.) Defendants argue that Plaintiff fails to state a § 1983 conspiracy claim. (Defs.' Mem. 7–9.) "To prove a § 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson*, 200

---

[17] To the extent that Plaintiff alleges a substantive due process claim under the Fourteenth Amendment, it is the same as his Eighth Amendment claim for deliberate indifference to his medical needs. (*See, e.g.*, Pl.'s Mem. 2 (noting that Plaintiff has claims "on the grounds of the 8th [and] 14th Amendments" and describing his "adequate medical care violation"); *id.* at 12 ("[T]hese actions definitely constitute serious violations to the 8th [and] 14th Amendments of the U.S. Constitution as well as adequate medical violation as no one should be subjected to cruel [and] unusual punishment or deprived of life or denied adequate medical care.").) Because Plaintiff's claim "is covered by . . . [the] Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 843 (1998) (internal quotation marks omitted); *see also Kia P. v. McIntyre*, 235 F.3d 749, 757–58 (2d Cir. 2000) ("Where another provision of the Constitution provides an explicit textual source of constitutional protection, a court must assess a plaintiff's claims under that explicit provision and not the more generalized notion of substantive due process." (alteration and internal quotation marks omitted)). Because Plaintiff does not allege any additional conduct that "is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience," the Court concludes that Plaintiff's substantive due process claim is "subsumed in [his] more particularized allegations" regarding his Eighth Amendment claim. *Velez v. Levy*, 401 F.3d 75, 93, 94 (2d Cir. 2005) (quoting *Lewis*, 523 U.S. at 847 n.8). Accordingly, Plaintiff's substantive due process claim is dismissed.

F.3d 65, 72 (2d Cir. 1999); *see also Corsini v. Brodsky*, 2018 WL 1773501, at *2 (2d Cir. April 13, 2018) (same) (citing *Ciambriello v. Cty. of Nassau*, 292 F.3d 307, 324–25 (2d Cir. 2002)). Plaintiff has failed to satisfy this standard.

First, Plaintiff's allegations of conspiracy are wholly conclusory. Plaintiff alleges that Hennesy and Wright conspired with Bucolo "to have [Plaintiff] moved without following proper policy [and] procedure," (Compl. 5), and that "[i]t is obvious they all conspired to get me out of their prison before . . . [he] expired without medical assistance, (Pl.'s Mem. 10). However, he provides no facts plausibly suggesting an agreement between these Defendants to violate Plaintiff's Eighth or Fourteenth Amendment rights; rather, he asserts that their action alone proves an "obvious" conspiracy. This is plainly insufficient to state a § 1983 conspiracy claim. *See Ciambriello*, 292 F.3d at 325 ("[C]omplaints containing only conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights are properly dismissed." (internal quotation marks omitted)); *Thomas v. Demeo*, No. 15-CV-9559, 2017 WL 3726759, at *12 (S.D.N.Y. Aug. 28, 2017) (dismissing a § 1983 conspiracy claim because the complaint did not "provide even circumstantial allegations that the alleged conspiracy existed, much less any details as to the extent of the alleged agreement or how [the] [d]efendants collectively carried it out"); *Scalpi v. Town of E. Fishkill*, No. 14-CV-2126, 2016 WL 858925, at *5 (S.D.N.Y. Feb. 29, 2016) ("Allegations of a conspiracy to violate civil rights must be pleaded with specificity, and an otherwise invalid § 1983 claim cannot survive a motion to dismiss merely by mentioning the word 'conspiracy.'" (alterations and internal quotation marks omitted)); *Zahrey v. City of New York*, No. 98-CV-4546, 2009 WL 1024261, at *11 (S.D.N.Y. Apr. 15, 2009) (dismissing conspiracy claim where the plaintiff "provide[d] no evidence, absent the fact that the [i]ndividual [d]efendants worked

together, that . . . an agreement existed").

Moreover, even assuming there was an agreement to do something, Plaintiff alleges that it was to violate DOCCS policy—specifically, an unspecified "policy and procedure that prohibits the transferring of inmates prison to prison while sickly or injured." (Pl.'s Mem. 8.) As explained earlier, "failure to follow a DOCS Directive or prison regulation does not give rise to a federal constitutional claim." *Rivera*, 232 F. Supp. 2d at 123. Nor does the mere transfer of Plaintiff from one prison to another violate the Constitution. *See Meachum v. Fano*, 427 U.S. 215, 228–29 (1976) (holding that the Due Process Clause does not protect against discretionary decisions to transfer a prisoner to another prison); *Davis v. Kelly*, 160 F.3d 917, 920 (2d Cir. 1998) ("A prisoner has no liberty interest in remaining at a particular correctional facility, but prison officials may not transfer an inmate in retaliation for the exercise of constitutionally protected rights. . . ." (citations omitted)); *Perez v. Ponte*, 236 F. Supp. 3d 590, 615 (E.D.N.Y. 2017) ("[T]he mere fact that Plaintiff was not given a rationale for the transfer is not, without more, sufficient to show that there was a clear intent on the part of prison officials to punish him—a necessary condition to setting forth a plausible claim that his Due Process rights were violated because of the transfer itself."), *adopted by* 2017 WL 1050109 (E.D.N.Y. Mar. 15, 2017). Plaintiff has thus failed to plausibly allege a conspiracy "to inflict an unconstitutional injury." *Pangburn*, 200 F.3d at 72.[18] The Court therefore grants the Motion to Dismiss

---

[18] Even construing Plaintiff's submissions to raise a claim for conspiracy to deprive him of medical care by transferring him, again, Plaintiff does not plausibly allege an agreement between Wright and Hennesy and Bucolo to do so. Indeed, Plaintiff was seen by Nurse Johnsosocko immediately upon his arrival at Sing Sing, then OMH Therapist Coonley and Doctor Ezekwe, and then was taken to Mount Vernon Hospital, all within 24 hours. (Compl. 5; Psychiatric Progress Note.) To the extent Plaintiff believes that these Sing Sing employees deprived him of medical care, Plaintiff does not allege that they conspired with Defendants to do so, and thus, these non-defendants cannot be held independently liable for any such conduct.

Plaintiff's conspiracy claim against Wright, Hennesy, and Bucolo.

## III. Conclusion

For the foregoing reasons, Defendants' Motion to Dismiss is granted in part and denied in part. The Court dismisses the claims against Wright and Hennesy, the § 1983 conspiracy claim, and the Fourteenth Amendment substantive due process claim. However, because this is the first adjudication of Plaintiff's claims on the merits, the dismissal is without prejudice. *See Terry v. Inc. Vill. Of Patchogue*, 826 F.3d 631, 633 (2d Cir. 2016) (explaining that "district judges should, as a general matter, liberally permit pro se litigants to amend their pleadings" unless "amendment would be futile").

Should Plaintiff choose to file an amended complaint, he must do so within 30 days of this Opinion, addressing the deficiencies identified herein. The new amended complaint will replace, not supplement, the complaint currently before the Court. It therefore must contain *all* of the claims and factual allegations Plaintiff wishes the Court to consider. The Court will not consider factual allegations raised in supplemental declarations, affidavits, or letters. If Plaintiff fails to abide by the 30-day deadline, the dismissed claims could be dismissed with prejudice, and the case will go forward only on the Eighth Amendment claims against Bowden, Bucolo, and Bentivegna.

The Clerk of the Court is respectfully requested to terminate the pending motion, (Dkt. No. 31), and to mail a copy of this Opinion to Plaintiff.

SO ORDERED.

Dated: May ___, 2018
White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

35